**IT IS ORDERED as set forth below:**



**Date: April 19, 2021**

_Wendy L. Hagenau_

_____
**Wendy L. Hagenau**
**U.S. Bankruptcy Court Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 15-58443-WLH |
| NILHAN DEVELOPERS, LLC, | CHAPTER 11 |
| Debtor. | |
| IN RE: | CASE NO. 15-58444-WLH |
| NRCT, LLC, | CHAPTER 11 |
| Debtor. | |

### ORDER ON MOTIONS TO (1) REMOVE THE CHAPTER 11 TRUSTEE; (2) DISQUALIFY GLASSRATNER ADVISORY & CAPITAL GROUP, LLC, ACCOUNTANTS FOR THE TRUSTEE; (3) DISGORGE ANY FEES AND EXPENSES OF THE TRUSTEE; AND, (4) DISGORGE ANY FEES AND EXPENSES OF THE ACCOUNTANTS FOR THE TRUSTEE

1

**THIS MATTER** is before the Court on the Motions to (1) Remove the Chapter 11 Trustee; (2) Disqualify GlassRatner Advisory & Capital Group, LLC, Accountants for the Trustee; (3) Disgorge Any Fees And Expenses of the Trustee; and, (4) Disgorge Any Fees And Expenses of the Accountants for the Trustee filed by Niloy Thakkar and Rohan Thakkar as equity interest holders in the Debtors Nilhan Developers, LLC and NRCT, LLC (Case No. 15-58443 Doc. No. 238 & Case No. 15-58444 Doc. No. 178) (the "Motions"). The Motions require the Court to determine whether Ron Glass ("Mr. Glass" or the "Trustee") and GlassRatner Advisory & Capital Group, LLC ("GR") were and are disinterested, held or hold or represent an interest adverse to the estate, or failed to make adequate disclosures about GR's connections to NCT and Gateway (as defined below).

The Court has jurisdiction over the parties and subject matter of these contested matters pursuant to 28 U.S.C. §§ 1334(b) and 157(a), and this is a core matter under 28 U.S.C. §§ 157(b)(1) and (2)(A).

I.   **FACTS**

a.   General

The Court makes the following finding of general facts. Nilhan Developers, LLC ("Nilhan Developers"), NRCT, LLC ("NRCT"), Bay Circle Properties, LLC ("Bay Circle"), DCT Systems Group, LLC ("DCT"), and Sugarloaf Centre, LLC ("Sugarloaf"), (collectively the "Debtors"), each filed a petition for relief under Chapter 11 of the Bankruptcy Code on May 4, 2015. The cases were procedurally consolidated. The manager of each of the Debtors is Chuck Thakkar, the father of Niloy and Rohan Thakkar. Ownership in each debtor differs somewhat but is generally held by members of the Thakkar family and/or a company the Thakkars own in part. According to the schedules,

2

1. Nilhan Developers is owned 50% by Niloy Thakkar and 50% by Rohan Thakkar (Case No. 15-58443 Doc. No. 18 p.5);

2. NRCT is owned 50% by Niloy Thakkar and 50% by Rohan Thakkar (Case No. 15-58444 Doc. No. 18 p. 5);

3. Bay Circle is owned 50% by Chuck Thakkar and 50% by his wife, Saloni Thakkar (Case No. 15-58440 Doc. No. 18 p. 5);

4. DCT is owned by 50% by Niloy Thakkar and 50% by Rohan Thakkar (Case No. 15-58441 Doc. No. 19 pp. 5-6); and

5. Sugarloaf is owned 100% by Sugarloaf Centre Partners, LLC (Case No. 15-58442 Doc. No. 18 p. 5), which in turn is owned 50% by NRCT (one of the Debtors) and 50% by NCT Systems, Inc. ("NCT").

The immediate reason the Debtors filed bankruptcy was their default on a series of loan agreements with Wells Fargo Bank, N.A.[1]  The obligations to Wells Fargo were secured by certain real property owned by the Debtors.  The first several months of these cases were devoted to the Debtors liquidating or refinancing various pieces of property to meet milestone payment deadlines agreed to by Wells Fargo.

Behind the scenes, these bankruptcy cases have been impacted and driven to a certain extent by litigation between Mr. Thakkar and his family, on the one hand, and Good Gateway, LLC and SEG Gateway, LLC (collectively "Gateway"), on the other.  Prior to the filing of the bankruptcy petitions, Gateway obtained judgments in the amounts of $2.5 million and $12 million against Mr. Thakkar and other non-debtor entities in a Florida state court.

---

[1] Wells Fargo Bank, N.A. began its association with the Debtors in 2008.  The history is set out in several prior orders issued by the Court, including the Order Denying Substantive Consolidation (Case No. 15-58440 Doc. No. 797).

All of the Debtors except NRCT liquidated property to satisfy Wells Fargo. NRCT held only non-income producing real property and did not liquidate any real property to pay Wells Fargo. As one of the milestone payments was approaching, Bay Circle sought to sell its property. Gateway held a judgment lien on a one-half interest in the Bay Circle property by virtue of Mr. Thakkar's prior ownership of a one-half interest in the property. Gateway objected that its interest in the Bay Circle property was unnecessarily lost and asked for adequate protection of the lien it lost by virtue of the sale of the Bay Circle property. The Court approved the sale and provided Gateway a replacement lien on Bay Circle's claims for contribution and subrogation ("Contribution Claim") (Case No. 15-58440 Doc. No. 797) (the "AP Order"). The Court later modified the AP Order.

At various times in the cases, Gateway has claimed multiple interests in the Debtors' cases. First, Gateway claims 100% ownership of NCT, an indirect owner with NRCT of Sugarloaf. Gateway acquired its interest in NCT by virtue of its judgment and a court order transferring the stock of NCT to Gateway. In compliance with the order, Mr. Thakkar executed a transfer agreement on August 9, 2017 and, on August 11, 2017, he delivered the stock certificate to Gateway. Second, Gateway claims an economic interest in NRCT, by way of a judgment against Rohan Thakkar and certain charging orders. Third, Gateway asserts an interest in claims of Nilhan Financial, LLC ("Nilhan Financial"), an entity also previously controlled by the Thakkars. Nilhan Financial is a creditor of all the Debtors including Nilhan Developers and NRCT. Gateway filed notices of transfer of Nilhan Financial's claims against Bay Circle to it on March 10, 2017. Later, Nilhan Financial had its own Chapter 7 bankruptcy case in Florida in which Gateway had various claims. On May 18, 2018, Gateway and the Nilhan Financial Trustee filed a motion in the Florida case seeking approval of a settlement agreement pursuant to which Gateway would receive 50%

of, inter alia, any recovery by Nilhan Financial in the Nilhan Developers and NRCT cases. The settlement was approved on September 6, 2018 (Case No. 8:17-bk-03597-MGW, Bankr. M.D. Fla. Sept. 6, 2018, Docs. Nos. 210 & 292). Fourth, Gateway holds the Contribution Claim in the Bay Circle Case. Fifth, Gateway requested discovery from Sugarloaf and NRCT on July 31, 2018 (Case No. 15-58440 Docs. Nos. 856 & 857) relating to the management, organization, and formation of Sugarloaf and Sugarloaf's sole member, Sugarloaf Centre Partners, LLC, which is owned 50% by NCT and 50% by NRCT.[2]

On October 10, 2018, after learning about actions taken without Court approval in the Nilhan Developers case, actions which are extensively detailed in prior orders (see e.g., Amended and Restated Order on Claim of Norcross Hospitality, Case No. 15-58443 Doc. No. 164), the Court entered an order requiring the parties to show cause why a trustee should not be appointed. In short, without notifying the Court or his counsel and without Court approval, Mr. Thakkar, on behalf of Nilhan Developers, exercised an option to re-acquire property for over $9 million and incurred unauthorized secured post-petition financing in that amount from an insider (for over $5 million) and a third party.

After a hearing on the show cause order, the U.S. Trustee filed a Motion to Appoint a Chapter 11 Trustee (Case No. 15-58440 Doc. No. 903) on November 8, 2018. The Court held a hearing on the Motion to Appoint Chapter 11 Trustee on December 4, 2018. The Court found the U.S. Trustee had established a trustee was necessary for cause under section 1104, due to management's incompetence, gross mismanagement, dishonesty, lack of trustworthiness, self-

---

[2] The Court granted the requests on August 1, 2018 (Case No. 15-58440 Docs. No. 858 & 859). Gateway then filed a motion to compel the production on November 30, 2018, contending Sugarloaf and NRCT did not produce the documents as directed (Case No. 15-58440 Doc. No. 912). The Trustee, upon his appointment, later responded on February 28, 2019, stating he was not aware of any documents in his possession, custody, or control responsive to the requests (Case No. 15-58440 Doc. No. 988).

dealing with insiders, and the consistent failure to follow the rules and procedures of the Bankruptcy Code.

The Court explained that cause existed to appoint a trustee in all five cases, and it was in the best interest of creditors in each case to do so. The Court also believed an independent party was needed to analyze Bay Circle's Contribution Claim—to review the financials of all five debtors to "see who paid what and see if, in fact, there is a contribution claim that Bay Circle has against anyone." The Court stated, "[y]ou need to figure out if there is, in fact, a claim, and I think a trustee is an ideal person to do that, get their accountant involved and actually, . . . get the books and records together and figure out who paid what and . . . whether Bay Circle has a claim or not." In NRCT, the Court noted a trustee was appropriate because NRCT had significant assets and, given management's willingness in the Nilhan Developer's case to buy, sell, and encumber estate assets without Court permission, a trustee was necessary to ensure the assets remained unencumbered until deemed necessary (unless and until it was determined there was some reason that they need to be liquidated to pay claims, i.e. the Contribution Claim). Ultimately, the Court counseled it wanted a trustee to methodically analyze what was necessary in all the cases.

At the conclusion of the December 4, 2018 hearing, the Court ordered the appointment of a trustee. Counsel for the U.S. Trustee stated the U.S. Trustee would solicit suggestions from any parties in interest as to who should serve as a trustee and invited anyone with a person to nominate to do so by the close of business on December 6, 2018. On December 11, 2018, the U.S. Trustee filed a Notice of Appointment of Chapter 11 Trustee and Setting of Bond (Case No. 15-58440 Doc. No. 920), and an Application for Approval of Appointment of Trustee (Case No. 15-58440 Doc. No. 921), which is discussed in more detail below. That same day, the Court entered an order

granting the Motion for the Appointment of a Chapter 11 Trustee (Case No. 15-58440 Doc. No. 919), and an order approving Mr. Glass as Trustee (Case No. 15-58440 Doc. No. 922).

On December 20, 2018, the Trustee filed an Application to Employ GR as Financial Advisor (Case No. 15-58440 Doc. No. 934), which is described below. GR is a firm named for Mr. Glass and Ian Ratner ("Mr. Ratner"). It has provided services for many years in the Atlanta market and elsewhere, including forensic accounting, workout and restructuring services, and services as a trustee, receiver, and chief restructuring officer. The Court granted the application to employ GR on January 22, 2019 (Case No. 15-58440 Doc. No. 965).

Eventually, the Trustee moved forward in each case to bring matters to a posture to be decided by the Court. When it became clear the cases were all taking different paths to resolution, the cases were severed on May 5, 2020 (Case No. 15-58440 Doc. No. 1420). The DCT case was dismissed on May 1, 2020 (Case No. 15-58440 Doc. No. 1417). Bay Circle was converted to a case under Chapter 7 (Case No. 15-58440 Doc. No. 1420), and John Lewis, Jr. was appointed as Chapter 7 Trustee. The Court entered an order granting GR's Final Application for Compensation and Reimbursement of Expenses in the Bay Circle case on June 22, 2020 (Case No. 15-58440 Doc. No. 1444).

In Sugarloaf, the Trustee sold real property and initially filed a Chapter 11 plan. After the secured lender filed a proof of claim that far exceeded the amount anticipated, the Trustee determined dismissal was in the best interest of all parties. The Trustee objected to and settled the lender's claim, and then moved to dismiss the case on August 5, 2020 (Case No. 15-58442 Doc. No. 147). The Court granted the Motion to Dismiss on August 28, 2020, subject to the final fee applications being approved (Case No. 15-58442 Doc. No. 164). Final fee applications were

approved on November 17, 2020 (Case No. 15-58442 Docs. Nos. 200-202), and the orders approving the applications are currently on appeal.

In the NRCT case, the Court confirmed the Trustee's Fourth Amended Plan (Case No. 15-58444 Docs. Nos. 131 & 132) and denied a request to dismiss the case filed by Mr. Thakkar (Case No. 15-58444 Doc. No. 133). The plan provided for the Trustee to hold property of the estate pending the outcome of the Contribution Claim and for disbursement upon its resolution. The plan also provided for a release of the Trustee and GR for actions that predated the effective date. Mr. Thakkar appealed the confirmation order, but the appeal was dismissed (Case No. 15-58444 Doc. No. 170). The effective date of the plan was November 17, 2020 (Case No. 15-58444 Doc. No. 171).

In the Nilhan Developers case, the Court confirmed the Trustee's Sixth Amended Plan on December 8, 2020 (Case No. 15-58443 Doc. No. 227), and the plan became effective on December 23, 2020. The plan provided for immediate payment to certain creditors, and alternative means of distribution to Nilhan Financial and Norcross Hospitality (an entity owned by Rohan and Niloy Thakkar) depending on the outcome of Norcross Hospitality's appeal of this Court's order regarding its entitlement to payment. The plan also provided for the release of the Trustee and GR for actions that pre-dated the effective date.

As the cases have wound towards resolution, the Trustee and his professionals have filed final applications for compensation. The Motions were filed in response to Final Fee Applications in the Nilhan Developers case on January 5, 2021 (Case No. 15-58443 Doc. No. 238) and in the NRCT case on January 8, 2021 (Case No. 15-58444 Doc. No. 178). Niloy and Rohan Thakkar contend Mr. Ratner, Mr. Glass's business partner at GR, represented an adversary of the equity holders of Nilhan Developers and NRCT when he served as the President and Director of NCT, as

reflected on documents filed with the Florida Secretary of State on September 10, 2018 (prior to the appointment of Mr. Glass as Trustee), until a new filing removed Mr. Ratner from the designated positions on April 26, 2019.  GR and Mr. Glass vehemently oppose the Motions, arguing GR and Mr. Glass did not hold or represent a materially adverse interest to the estate and were, and have been, disinterested.

The Court set the Motions for hearing on February 22, 2021, before having a hearing on the merits of GR's and Mr. Glass's fee applications.  Mr. Glass and GR filed a Motion for Involuntary Dismissal Under Rule 52(c) on February 19, 2021 (Case No. 15-58443 Doc. No. 279 & Case No. 15-58444 Doc. No. 216), asking the Court to dismiss Niloy and Rohan Thakkar's claims and enter judgment in favor of Mr. Glass and GR.

The evidentiary hearing was attended by Mr. Glass, Mr. Ratner, William A. DuPré, IV and Kimberly A. Miller (counsel for Mr. Glass and GR), John A. Moffa (counsel for Niloy and Rohan Thakkar), Frank Wilensky (local counsel for Niloy and Rohan Thakkar), David Weidenbaum (counsel for the U.S. Trustee), and Walter Jones (of Balch & Bingham LLP; Gateway's local counsel).  After considering the evidence presented, and the testimony of Mr. Glass, Mr. Ratner, and Mr. Jones, the Court took the Motions under advisement and invited the parties to file supplemental briefs.  On March 8, 2021, Mr. Glass and GR (Case No. 15-58444 Doc. No. 218), the U.S. Trustee (Case No. 15-58444 Doc. No. 219); and Niloy and Rohan Thakkar (Case No. 15-58444 Docs. Nos. 220 & 221) filed supplemental authority in support of their positions.

b.   Facts Represented Prior to Hearing

The facts relating to this matter have evolved as more information has come to light.  The facts originally presented in the Trustee's affidavit in connection with retention, in the Motions and response to the Motions, and in Mr. Ratner's declaration, are as follows.

9

i.  Declarations

A Verified Statement of Ronald Glass was attached to the Application for Approval of

Appointment of Trustee (Case No. 15-58440 Doc. No. 921).  The affidavit stated, in part:

> To the best of my knowledge, information, and belief, I do not hold or represent
> any interest adverse (i) to the estate of the Debtors; or (ii) to any class of creditors
> or equity security holders, by reason of any direct or indirect relationship to,
> connection with, or interest in, the Debtors, or for any other reason.

> In September 2018, my partner, Ian Ratner, was approached by Walter Jones, Esq.
> of Balch & Bingham, on behalf of NCT Systems, Inc. to serve as an Officer and as
> a Board Member.  Subsequently, an engagement letter was sent to NCT. The letter
> was not executed. No conversations or information was exchanged, and
> GlassRatner did no work on this matter.

> I will promptly advise the Bankruptcy Court and the Office of the United States
> Trustee of any circumstances that cause the foregoing to change.

The Application to Employ GR (Case No. 15-58440 Doc. No. 934), included a Declaration

of William McCaleb ("Mr. McCaleb"), a Managing Director of GlassRatner, which stated:

> GlassRatner is a "disinterested person" as that term is defined in Section 101(14)
> of the Bankruptcy Code, in that, except as otherwise disclosed herein, GlassRatner,
> its principals, managing directors, managers and other employees
>
>> a. Are not creditors, equity holders, or insiders of Debtors;
>> b. Are not and were not, within 2 years before the date of filing of
>> the petition, a director, officer, or employee of the Debtors; and
>> c. Do not have interests materially adverse to the interests of the
>> estates or of any class of creditors or equity security holders, by
>> reason of any direct or indirect relationship to, connection with, or
>> interest in, the Debtors, or for any other reason.

> To the best of my knowledge, information, and belief formed after reasonable
> inquiry, other than in connection with this case, neither GlassRatner nor I have any
> connection with the Debtors, their creditors, the United States Trustee, any
> employee of the Office of the United States Trustee, the Bankruptcy Judge
> presiding in this case, or any party in interest (including their respective attorneys
> and accountants), except that (a) GlassRatner may have been engaged from time to
> time in the past, and may be engaged in the future, in other matters where one or
> more of such parties may have been or may be involved; and (b) GlassRatner may
> have been engaged by certain creditors and other parties in interest or their
> attorneys, accountants, or professionals in other matters unrelated to the Debtors'

jointly-administered cases. GlassRatner is a specialty financial advisory services firm. As a result, GlassRatner has and may in the future represent certain parties-in-interest in matters unrelated to the Debtors' jointly-administered cases.

### ii.   Allegations in Motions

The Motions allege neither Mr. Glass nor GR were disinterested by virtue of Mr. Ratner's role as an officer and director of NCT.  The Motions allege that NCT was dissolved by the Florida Secretary of State at some point in 2017.  On September 10, 2018, NCT was reinstated by the filing of a 2018 Florida Profit Corporation Reinstatement with the Florida Secretary of State (the "Reinstatement").  The Reinstatement listed Mr. Ratner as President and Director of NCT, and it was electronically signed by "Ian Ratner, President, 09/10/2018."  Mr. Ratner continued on record as President and Director until a 2019 Annual Report for NCT was filed with the Secretary of State, Division of Corporations, on April 26, 2019 identifying Good Gateway, LLC as NCT's President and Director.

### iii.   Response to Motions

The position of GR and Mr. Glass is that Mr. Jones contacted Mr. Ratner about a possible engagement and, while there were preliminary discussions between GR and Mr. Jones in which the parties discussed Mr. Ratner serving as a corporate officer and/or director for NCT, the conversations did not result in Mr. Ratner or GR being appointed and engaged.  Mr. Ratner's declaration contends that in or about July 2018, several months prior to the appointment of Mr. Glass and GR, Mr. Jones contacted Mr. Ratner by phone on behalf of Clay Townsend (Gateway's counsel at Morgan & Morgan, P.A. ("Mr. Townsend")), Gateway, and NCT to possibly engage GR to provide services.  During a July 2018 telephone call, Mr. Jones provided Mr. Ratner and his colleague, Jason Cristal ("Mr. Cristal"), with general background information about the scope and terms of the potential engagement.  GR ran a conflicts' check and sent a proposed engagement

letter to Mr. Jones, outlining the proposed scope and terms of the proposed engagement, on September 7, 2018.

Mr. Glass and GR characterize these discussions as preliminary and the relationship with Gateway and NCT as brief and limited. Mr. Ratner acknowledged he sent an engagement letter to Mr. Jones on September 7, 2018. Mr. Ratner contended, however, that he had no recollection of receiving or reviewing the draft Written Consent of the Shareholders of NCT authorizing Mr. Ratner to serve as President, Secretary, and Director of the company, and GR never received a copy of the engagement letter signed by the named counterparties: NCT Systems, Good Gateway, and Morgan & Morgan. Mr. Glass and GR maintained that neither Mr. Ratner nor GR were ever engaged or instructed to perform any services for Good Gateway, NCT Systems, or Morgan & Morgan. They stated GR never opened a file, performed any work, or billed for any work related to the proposed engagement. According to Mr. Ratner, other than the draft Written Consent of the Shareholders and the engagement letter, GR neither received nor reviewed any other documents related to the proposed engagement, and no one at GR received any further information or instruction with respect to the proposed engagement.

On September 10, 2018, NCT filed the Reinstatement. Mr. Ratner states he was unaware of the filing.

The U.S. Trustee contacted Mr. Glass, at least by December 7, 2018, regarding serving as trustee. Mr. Glass contends he disclosed Mr. Ratner's prior contacts with NCT in response to the U.S. Trustee's inquiry to him. On December 7, 2018, Mr. Glass sent to the U.S. Trustee the proposed engagement letter between GR and NCT stating, "The letter was never signed and GlassRatner has not spoken to representatives of the company or done any work." In response, the U.S. Trustee office stated, "The Verified Statement needs to mention the proposed September

7, 2018 Engagement Letter Agreement with [NCT].  I'm not looking for a full-scale recitation, but I do need a succinct description and ultimate outcome."  Mr. Glass's verified statement did not include the engagement letter and Mr. McCaleb's Declaration did not mention Mr. Ratner's proposed engagement with NCT, nor did it refer to or incorporate Mr. Glass's affidavit.

Mr. Ratner stated he did not hear anything more from Gateway or NCT about the engagement.  He said, at some point in April 2019, he learned his name appeared on the Florida Secretary of State's website as President and Director of NCT.  Mr. Ratner maintained he never served in either role, and he never authorized anyone to submit a record with the Florida Secretary of State indicating he held a position with NCT.  In an email sent April 22, 2019, Mr. Ratner asked Mr. Jones to have the records corrected.  A new Annual Report was filed on April 26, 2019 and Mr. Ratner was not listed as an officer or director.  Nevertheless, the Reinstatement was never amended or withdrawn.  Neither Mr. Glass nor GR supplemented their disclosures to explain what had been discovered about Mr. Ratner's prior identification as President and Director or the subsequent annual report naming a new President and Director.

### c.  Facts Learned from Evidentiary Hearing

The evidence and testimony presented at the hearing on the Motions shows the relationship between Mr. Ratner, GR, and NCT/Gateway was much more extensive than the brief and limited interaction GR and Mr. Glass described.  The evidence shows that, contrary to what GR and Mr. Glass originally claimed and Mr. Ratner stated in his declaration, there were extensive discussions about and numerous iterations of the engagement letter. Mr. Ratner signed the engagement letter knowing it would be forwarded to Gateway for signature, and Mr. Ratner acknowledged receipt of the NCT Written Consent of Shareholders and authorized Gateway to "proceed."  The Court makes the following findings of fact.

In June 2018, earlier than originally believed, Mr. Jones contacted Mr. Ratner about GR providing services as an officer of NCT.  A sample engagement letter was sent by GR to Mr. Jones on June 1, 2018.  On July 23, 2018, Mr. Jones emailed Mr. Ratner asking for a proposal from GR "along the lines . . . [of] the example engagement letter you sent me last month."  He described the engagement, stating:

> [W]e would want you to serve as non-member manager/CRO for an entity called **Sugarloaf Centre Partners, LLC**.  That entity is owned 50/50 by **NCT Systems, Inc.** and **NRCT**.  Our client holds 100% of the stock in NCT Systems. NRCT is a debtor in a chapter 11 bankruptcy case before Judge Hagenau. Sugarloaf Centre Partners is the sole member in an entity called **Sugarloaf Centre, LLC**, which is also a chapter 11 debtor in bankruptcy.

Mr. Jones also provided Mr. Ratner with some background information.  He wrote:

> The principal of NRCT is an individual named Chuck Thakkar.  Our client and Thakkar have been engaged in litigation in Florida for nearly 10 years.  Our client holds a $15 million judgment against Thakkar and various entities of his, although not against the Sugarloaf entities.  Our client, on account of its 50% membership in Sugarloaf Centre Partners (by way of its 100% interest in NCT Systems), would like to assert control over Sugarloaf Centre Partners and thus assert control over Sugarloaf Centre, LLC, which owns valuable property in Atlanta.  The Sugarloaf Centre, LLC property is subject to the lien of a DIP lender that we believe is affiliated with Thakkar.
>
> Until recently, John Christy represented Thakkar, NRCT, and the Sugarloaf entities. Denise Dotson has recently stepped in. Either way, Thakkar is litigious. Florida counsel is providing us with corporate documentation concerning Sugarloaf Centre Partners so that our corporate guys can determine whether NCT Systems has an absolute contractual right to replace Thakkar or his entity as manager of Sugarloaf Centre Partners, LLC.  Otherwise, we will be forced to file an adversary proceeding.

Mr. Ratner responded stating that he could discuss "on Thursday," and Mr. Jones and Mr. Ratner talked about the engagement that Thursday, July 26, 2018.  The planned length of the call was 30 minutes.  That same day, at 6:05 p.m., Mr. Cristal sent a template fiduciary engagement letter to Mr. Jones.

Discussions continued until August, as evidenced by an email from Mr. Cristal on August 10, 2018 scheduling a further call for "Monday." By early September, Gateway was prepared to move forward with the engagement. One impetus, according to Mr. Jones, was that Sugarloaf had filed a Motion to Dismiss its bankruptcy case on July 25, 2018 (Case No. 15-58442 Doc. No. 100).[3] Gateway wanted to object to the motion.[4] NCT had been administratively dissolved in Florida and needed to be reinstated, in Mr. Jones' opinion, to file such an opposition.

The engagement of GR was finalized through a series of emails and drafts on September 6 and 7, 2018. On September 6, 2018, Mr. Jones emailed Mr. Ratner to set up a time to talk about "a couple of possible engagements, including the one we discussed previously." They agreed to speak that afternoon.

The next day, September 7, 2018, at 10:39 a.m., Mr. Jones sent Mr. Ratner a draft of an engagement letter based on the template sent by GR on July 26, 2018. Mr. Jones filled in the description of the engagement and proposed that Mr. Glass and Mr. Ratner be co-CEO's. The email states:

> As a follow up to my discussion with Ian yesterday, our clients Good Gateway, LLC and Carson Good, would like to proceed with engaging GlassRatner to first have Ian appointed as President/CEO of NCT Systems, Inc. and then to serve as manager of Sugarloaf Centre Partners, LLC and Sugarloaf Centre, LLC, assuming we are successful in gaining control of those two entities through a court action. As you will recall, Good Gateway, LLC is the sole shareholder of NCT Systems, Inc., which is a 50% owner of Sugarloaf Centre Partners, LLC, which is the sole member

---

[3] The Motion to Dismiss was docketed only in Sugarloaf's bankruptcy case, though the cases were then jointly administered.

[4] Gateway filed an Emergency Motion to Reschedule Hearing (Case No. 15-58440 Doc. No. 871) seeking to reschedule the hearing on Sugarloaf's motion to dismiss set for August 30, 2018. Gateway argued the hearing conflicted with a hearing in the Nilhan Financial bankruptcy case in Florida on the settlement agreement between Gateway and the Nilhan Financial trustee which ultimately provided Gateway with a share of any recovery Nilhan Financial would receive on its claims filed in the Nilhan Developers and NRCT cases. Gateway asked the Court to delay the hearing on Sugarloaf's motion to dismiss until after consideration of the Debtors' disclosure statements in mid-October. Sugarloaf responded in opposition, stating it wanted to continue with the hearing on the motion to dismiss as scheduled to pursue dismissal and, ultimately, refinancing (Case No. 15-58440 Doc. No. 872). On August 23, 2018, the Court rescheduled the hearing for September 11, 2018 (Case No. 15-58440 Doc. No. 874).

of Sugarloaf Centre, LCC, a chapter 11 debtor and the owner of valuable CRE in Atlanta.

Attached is [a] redline and clean copy of the Engagement Letter you sent over, together with the corporate docs that counsel in Florida prepared concerning NCT Systems. Appointing Ian as President/CEO of NCT Systems is not adversarial considering Carson's entity, Good Gateway, is the sole shareholder. It's the first step in the ultimate action. We need to finalize the appointment as soon as possible because we have to file an Objection to a Motion to Dismiss Sugarloaf Centre's bankruptcy.

The email also included a proposed Written Consent of the Shareholders where Good Gateway, as the shareholder of NCT, authorized and instructed NCT

to take all appropriate actions to reinstate the Corporation and to amend the annual report to reflect Ian Ratner as President, Secretary, and Director; Ian Ratner as Director; the Registered Agent as Morgan & Morgan, PA c/o Clay Townsend, Esq; the principal place of business as 174 W. COMSTOCK AVENUE, STE. 100, WINTER PARK, FL 32789[.]

The Written Consent of the Shareholders of NCT, when executed by Carson Good ("Mr. Good"), as manager of Good Gateway, LLC, would appoint Mr. Ratner as President, Secretary, and Director of NCT. The Written Consent included a recitation of the history of some of the litigation between Gateway and Mr. Thakkar and the basis for Gateway's assertion it owned NCT.

At 11:33 a.m. on September 7, 2018, Mr. Jones sent Mr. Ratner a second draft of the letter incorporating comments from his client Gateway. The email states, "to be consistent with the Consent I forwarded, I note the engagement as President." This revision continued to name Mr. Glass as co-president. A third revision of the engagement letter was sent by Mr. Jones at 12:11 p.m. It still contained the provision with Mr. Glass as co-president. At 12:50 p.m., Mr. Cristal of GR sent Mr. Jones a fourth revision of the engagement letter which, among other things, removed Mr. Glass as an officer.

A fifth revision was sent by Mr. Jones to Mr. Ratner at 1:55 p.m. Mr. Jones wrote: "See below from Clay with a small revision to the paragraph concerning Morgan & Morgan. Please let

us know that this meets with your approval and Clay will have it executed." He continued, "Also, we need the okay from you guys on the Shareholders Consent appointing Ian as President etc."

At 2:06 p.m., Mr. Cristal emailed "[t]his all looks fine to me, subject to Ian's approval." At 2:59 p.m., Mr. Townsend emailed that he was waiting for Mr. Ratner's approval before signing and sending to Carson Good of Gateway for signature. He wrote: "I will wait for Ian's approval before signing and sending to Carson. I would like to have Ian's and my signature on the final I send to Carson please. tx"

Mr. Ratner responded at 3:24 p.m., "All good—thank you—proceed." After several more emails asking Mr. Ratner to sign on September 7, 2018, Mr. Cristal emailed a copy of the engagement letter executed by Mr. Ratner at 4:25 p.m. to Mr. Jones and Mr. Townsend, copying Mr. Ratner and Austin Alexander (an attorney with Balch & Bingham ("Mr. Alexander")) ("Engagement Letter").

> The signed Engagement Letter provided:
>
> This letter confirms and sets forth the terms and conditions of the engagement between GlassRatner Advisory & Capital Group, LLC ("GlassRatner") and the Company [defined as NCT Systems, Inc.], including the scope of the services to be performed and the basis of compensation for those services. Upon execution of this letter by each of the parties below, this letter will constitute an agreement between the Company and GlassRatner. It is anticipated that the Company will file an action to gain control of Sugarloaf Centre Partners, LLC ("Sugarloaf Partners") and Sugarloaf Centre, LLC ("Sugarloaf Centre"), either in state court or in the chapter 11 bankruptcy case of Sugarloaf Centre, which case is pending in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, before The Honorable Wendy Hagenau (the "Control Action"). In the Control Action, the Company would seek to have GlassRatner appointed as non-member manager of Sugarloaf Partners and Sugarloaf Centre. Sugarloaf Centre owns and operates commercial, income producing real property in the Atlanta area.

The Engagement Letter contemplated Mr. Ratner and Mr. Cristal would work on the matter as well as "other staff as appropriate." The Engagement Letter provided all compensation to be paid by NCT to GR would be advanced by Gateway's counsel, Morgan & Morgan. GR's compensation

would be based on standard hourly rates (of $595 per hour for Mr. Ratner, $395 per hour for Mr. Cristal, and $225--$395 per hour for other staff) for the first three months of the assignment, after which GR would re-evaluate the fee structure and propose a monthly fixed fee.

The Engagement Letter was then signed by Mr. Good on behalf of Good Gateway, LLC. Mr. Jones received a fully executed copy of the Engagement Letter on September 10, 2018. However, Mr. Ratner testified GR never received the executed letter and Mr. Jones agreed he did not forward it.

In apparent reliance on the signed Engagement Letter and approval of the Written Shareholder Consent, NCT filed the Reinstatement on September 10, 2018 representing that Mr. Ratner was President and Director of NCT.  On the same day, Mr. Jones filed the opposition to Sugarloaf's motion to dismiss as planned (Case No. 15-58440 Doc. No. 878).  It stated Gateway was the sole shareholder of NCT, a 50% owner of Sugarloaf's sole member and, as such, it had an interest in the proper management of Sugarloaf and opposed dismissal (in light of Mr. Thakkar's involvement in the management and adversarial relationship between Mr. Thakkar and Gateway, Gateway wanted Sugarloaf to remain in bankruptcy).  Gateway also referenced the settlement agreement in the Nilhan Financial bankruptcy case and noted it had recently requested discovery from Sugarloaf and NRCT in their bankruptcy cases.[5]

On September 17, 2018, Mr. Cristal sent an email to Mr. Jones, Mr. Townsend, and Mr. Ratner, copying Mr. Alexander, stating: "I just wanted to follow up on the Engagement letter.  Is there anything additional you need from us[?]  Further, can we schedule a call, perhaps later this week, to update case status, plan, etc."  Mr. Ratner testified GR did not receive a response, and GR never opened a file, performed any work, or billed for any work related to the engagement.

---

[5] At a hearing on September 27, 2018, the Court denied Sugarloaf's motion to dismiss without prejudice.

On October 10, 2018, a month to the day after the Reinstatement was filed, the Court ordered parties to show cause why a trustee should not be appointed.  At the conclusion of the December 4, 2018 hearing, the Court ordered the appointment of a trustee.  Counsel for the U.S. Trustee stated he would solicit suggestions from any parties in interest as to who should serve as a trustee and invited anyone with a person to nominate to do so by the close of business on December 6, 2018.

Mr. Jones testified he spoke with the U.S. Trustee's office during the selection process and informed it of the prior contacts between NCT and GR.  While the U.S. Trustee, Mr. Glass, GR, and Mr. Jones had information about the details of the Engagement Letter, and Mr. Jones, Mr. Glass, and GR knew of the Reinstatement, none of this was filed with the Court or disclosed in any Court hearing.  Mr. Glass stated he never discussed the Reinstatement with Mr. Thakkar and had no reason to believe he knew all the details.

In early 2019, Mr. Ratner was deposed in an unrelated case in Florida.  There, he was asked about NCT's Reinstatement which had named him as President and Director of NCT.  Mr. Ratner testified he was surprised.  Upon return to Atlanta, he contacted Mr. Jones on April 22, 2019 via an email marked "URGENT" and asked Mr. Jones to remove his name as an officer and director. Mr. Jones contacted Mr. Townsend and, on April 26, 2019, NCT filed a 2019 Annual Report that identified Mr. Townsend as the registered agent and Good Gateway, LLC as NCT's President and Director.  Mr. Ratner's name was not listed on the annual report.  Mr. Ratner testified that he informed Mr. Glass about the Reinstatement and cure.  Mr. Glass and Mr. McCaleb did not amend their declarations to address the Reinstatement or the subsequent Annual Report, and no information about the Reinstatement was provided to the Court.

19

The cases continued on their paths to resolution. The Court learned about the Reinstatement and Mr. Ratner's roles in NCT for the first time on January 5, 2021, when the first of the Motions was filed.

## II.   APPLICABLE LAW

Separate standards apply to GR, as a professional to the Trustee, and Mr. Glass, as the Trustee. The Court will look at the law for each before applying the law to the facts.

### a.   Glass Ratner

Movants seek an order disqualifying GR. The burden of proof lies with the Movants, as the party seeking disqualification, to prove their case by a preponderance of the evidence. See Evans v. Artek Sys. Corp., 715 F.2d 788, 794 (2d Cir. 1983); In re Barkany, 542 B.R. 699, 714 (Bankr. E.D.N.Y. 2015).

### i.   Denial of Compensation Pursuant to Section 328

Movants' request that GR disgorge any fees and expenses previously paid, and that all other fees and expenses should be denied, is analyzed under section 328 of the Bankruptcy Code. Under section 328(c), and with exceptions that are not relevant,

> the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

11 U.S.C. § 328(c). This section is a penalty for professionals who fail to satisfy section 327(a)'s dual requirements by authorizing the bankruptcy court to deny compensation for services and reimbursement of expenses. Kravit, Gass & Weber, S.C. v. Michel (In re Crivello), 134 F.3d 831, 836 (7th Cir. 1998).

Section 327 states, in part:

> Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327.

> A "disinterested person," in turn, is defined as a person who

> (A) is not a creditor, an equity security holder, or an insider;
> (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
> (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in the debtor or for any other reason.

11 U.S.C. § 101(14). The requirement that a professional be "disinterested" cannot be waived or circumvented by agreement or consent among creditors and the debtor. See In re Granite Partners, L.P., 219 B.R. 22, 34 (Bankr. S.D.N.Y. 1998).

"In construing the disinterestedness standard, bankruptcy courts have held trustees and their retained professionals to a rigorous standard." In re MF Global Inc., 464 B.R. 594, 600-01 (Bankr. S.D.N.Y. 2011) (citing In re Allegheny Int'l, Inc., 117 B.R. 171, 178-79 (W.D. Pa. 1990)). "The purpose of the disinterestedness requirement is to avoid any associations or connections, whether direct or indirect, between potential employees of the trustee and the estate, which could introduce conflicting loyalties into the bankruptcy case." In re Barkany, 542 B.R. at 713 (citing Allegheny Int'l, Inc., 117 B.R. at 179 (citing In re Philadelphia Athletic Club, Inc., 20 B.R. 328, 333 (E.D. Pa. 1982))). "Adherence to the disinterestedness requirement avoids not only actual conflicts of interests, but the appearance of conflicts, as well." Id. "The requirements of section 327 cannot be taken lightly, for they 'serve the important policy of ensuring that all professionals appointed pursuant to [the section] tender undivided loyalty and provide untainted advice and

assistance in furtherance of their fiduciary responsibilities.'" In re Leslie Fay Cos., Inc., 175 B.R. 525, 532 (Bankr. S.D.N.Y. 1994).

The term "interest adverse to the estate" is not defined in the Code, but courts have held that a party is "adverse" to the estate if it possesses "either an 'economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant . . . or . . . a predisposition under the circumstances that render such a bias against the estate.'" In re Prince, 40 F.3d 356, 361 (11th Cir. 1994) (citation omitted). While the use of adverse interest differs slightly between section 327(a) and section 101(14) (in section 327(a) the professional must not hold or represent an interest adverse to the estate, while to be disinterested, the professional must not have an interest materially adverse to the interest of the estate, or any class of creditors or equity holders), courts have generally combined them and stated the adverse interest test is objective and precludes "any interest or relationship, however slight, that would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules." In re Black & White Stripes, LLC, 623 B.R. 34, 50 (Bankr. S.D.N.Y. 2020) (quoting Granite Partners, 219 B.R. at 33). "The determination of adverse interest is objective and is concerned with the appearance of impropriety." In re Angelika Films 57th, Inc., 227 B.R. 29, 38 (Bankr. S.D.N.Y. 1998). Whether an adverse interest exists is generally determined on a case-by-case basis. Black & White Stripes, 623 B.R. at 50 (citing In re AroChem Corp. 176 F.3d 610, 623 (2d Cir. 1999)). The interest "may be materially adverse either for one of the specific reasons delineated in the statute or 'for any other reason.'" In re Marvel Entm't Grp., Inc., 140 F.3d 463, 476 (3d Cir. 1998).

In determining whether to disqualify a professional who has or represents an interest adverse to the estate, courts have held that section 327(a) "mandates disqualification when there

is an actual conflict of interest[.]" In re First Jersey Sec., Inc., 180 F.3d 504, 509 (3d Cir. 1999);

In re Fullenkamp, 477 B.R. 826, 832 (Bankr. M.D. Fla. 2011).  But the court has "wide discretion

in deciding whether to approve the appointment of a law firm with a potential conflict."  Marvel

Entm't Grp, 140 F.3d at 477.  Whether a conflict is actual, potential, or presents an appearance of

conflict, and "the decision concerning whether to disqualify a professional . . . in situations not yet

rising to the level of an actual conflict[,] are matters committed to the bankruptcy court's sound

exercise of discretion."  In re Art Van Furniture, LLC, 617 B.R. 509, 515 (Bankr. D. Del. 2020)

(citation omitted).

On the one hand, a court may approve a professional with a potential conflict "where the

possibility that the potential conflict will become actual is remote," such as where the length and

extent of a prior representation were minimal.  In re Vascular Access Centers, L.P., 613 B.R. 613,

627 (Bankr. E.D. Pa. 2020) (citation omitted).  In Vascular Access before representing the debtor,

the professional represented an LLC that was clearly adverse to the debtor.  613 B.R. at 627.  The

court concluded that, at a minimum, the professional had a potential conflict of interest.  Id.

Throughout the course of the bankruptcy case, the professional only filed pleadings on behalf of

the debtor, not the LLC, and did not send any invoices to, or receive payment from, the LLC.  Id.

The court concluded, in light of the short period of time he represented the LLC, which did not

overlap with the firm's representation of the debtor, it would not exercise its discretion to

disqualify the professional based upon his potential conflict of interest.  Id.

On the other hand, even a prior engagement that is limited in scope and short may

disqualify a professional from later serving as a professional to the estate.  In Black & White

Stripes, 623 B.R. at 51, for example, the bankruptcy court found a law firm's prior representation

of the bankrupt LLC's members, in jointly administered Chapter 11 cases in which one of the

estate's most significant assets was its avoidance claims against these same members, was a disqualifying conflict that prevented the law firm's employment as general bankruptcy counsel to the debtors. The law firm argued its representation of the members was brief and its scope was adequately limited by the retainer agreement. Id. The court found, though, that the firm's position was belied by the plain terms of the state-court retainer, which provided for "review of the entire litigation file and services as may, in [the firm's] opinion, be necessary or proper in connection with that matter." Id. The court noted, however brief the firm's role was in the prior action, the representation undermined the firm's ability to perform faithfully as bankruptcy counsel. Id. at 52. The court concluded the prior representation created, at the very least, a potential conflict and it was "worrying that proposed counsel would be so dismissive of such claims." Id.

Courts have also found a professional may hold an interest adverse to the estate even in the absence of a formal agreement or formalized relationship. In In re New River Dry Dock, Inc., 497 F. App'x 882, 887 (11th Cir. 2012), the professional argued he had no formal agreement or understanding with the buyers. The court found that fact not material—while he "may not have formalized his relationship with the buyers", "he discussed working for them and had a strong expectation that he would work for them." Id. That strong expectation was enough to give him an interest adverse to the estate, and he should have disclosed that interest to the bankruptcy court. The court acknowledged the estate may not have suffered any actual financial loss because of the professional's relationship with the buyers, and the professional may not have intended to enrich himself at the expense of the estate, but the issue was not whether he caused any actual harm but, rather, whether the professional "could have unbiasedly made decisions in the best interest" of the estate. Id. (citing Prince, 40 F.3d at 360).

24

Some courts have found, as a general rule, one member's disinterestedness affects the entire firm's disinterestedness "such that the firm must be disqualified under section 327(a) of the Code." In re Essential Therapeutics, Inc., 295 B.R. 203, 211 (Bankr. D. Del.2003). The majority of courts to consider the issue, however, have found there is no *per se* rule of imputation. See In re McDermott Int'l, Inc., 614 B.R. 244, 254 (Bankr. S.D. Tex. 2020); In re Timber Creek, Inc., 187 B.R. 240, 244 (Bankr. W.D. Tenn.1995).

These courts observe there is no express basis for indirect or imputed disqualification in sections 101(14)(A) & (B), which provide a "disinterested person" means "a person that (A) is not a creditor, an equity security holder, or an insider; and (B) is not and was not, within 2 year before the date of the filing of the petition, a director, officer, or employee of the debtor." 11 U.S.C. § 101(14)(A) & (B). "Person" is defined in § 101(41) as including an "individual, partnership, and corporation". 11 U.S.C. § 101(41). Section 101(14) by its plain language applies only to the "person" serving in the defined capacity. Thus, an individual's disqualification under section 101(14)(A) or (B) will not automatically disqualify the individual's firm. In re Young Mens Christian Ass'n of Marquette Cty., 570 B.R. 64, 68-69 (Bankr. W.D. Mich. 2017) (attorney was disqualified under section 101(14)(B) but not necessarily his firm—"a distinct 'person' as that term is defined in section 101(41)"); In re Sea Island Co., 2010 WL 4386855, at *4 (Bankr. S.D. Ga. Oct. 20, 2010) (while some attorneys were disqualified under section 101(14)(A), the disqualifying interests did not disqualify the firm from representing the debtors provided the firm maintained an ethical screen with certain features).

An entire firm may, however, be non-disinterested due to one professional's involvement under section 101(14)(C), which covers a person (here the firm) that has:

an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14)(C).  Under this provision, one professional's direct connection with the estate or any class of creditors or equity security holders creates an indirect and potentially disqualifying connection for the professional's firm.  Sea Island Co., 2010 WL 4386855 at *3; In re Cygnus Oil & Gas, 2007 WL 1580111, at *3 (Bankr. S.D. Tex. May 29, 2007).

The foregoing law regarding disinterestedness and adverse interest as developed under section 327 applies in determining whether a court should deny fees under section 328.  The decision to discount or deny fees under section 328(c) is within the discretion of the bankruptcy court.  In Prince, the Court of Appeals for the Eleventh Circuit stated that "the language of 11 U.S.C. § 328(c) permits a court to deny compensation to professionals found not to be disinterested persons but does not require a denial of fees in those instances."  40 F.3d at 359.  Instead, the bankruptcy courts have "wide discretion to determine whether full or partial denial or disgorgement of fees and expenses is appropriate".  In re US Bentonite, Inc., 536 B.R. 948, 958 (Bankr. D. Wyo. 2015); see also In re Shelnut, 577 B.R. 605, 611–12 (Bankr. S.D. Ga. 2017).  This is true even if the court subsequently learns that a professional never should have been employed under section 327(a) in the first place.  If the court errs in approving a professional person's employment (when the person is either "not a disinterested person" or "represents or holds an interest adverse to the interest of the estate"), a bankruptcy court has discretion under section 328(c) to deny the erroneously employed professional's fees, in whole or in part.  In re Fish & Fisher, Inc., 574 B.R. 608, 614-16 (Bankr. S.D. Miss. 2017).  "[Section] 328(c) remains as a retroactive penalty for those professionals whose retention under § 327(a) was improper or who fail to satisfy § 327(a) requirements while working for the estate."  Id. at 616; see also In re

Mitchell, 497 B.R. 788, 793 (Bankr. E.D.N.C. 2013). A bankruptcy court should weigh the equities in deciding whether to deny fees under section 328(c), Crivello, 134 F.3d at 838, and may limit the denial or reduction of fees to the specific time period when the conflict existed. See e.g., In re Paine, 14 B.R. 272 (W.D. Mich. 1981).

A bankruptcy court retains jurisdiction over an award of fees even after the conclusion of the bankruptcy case. New River Dry Dock, 497 F. App'x at 886; see also Greater Blessed Assurance Apostolic Temple, Inc., 2021 WL 1117760, at *2 (Bankr. M.D. Fla. Mar. 24, 2021). Moreover, a Chapter 11 plan's "release of liability against professionals does not affect the Court's authority over the fees paid to those professionals." Id.; see 11 U.S.C. §§ 328(c), 330(a)(2). For example, in New River Dry Dock, the bankruptcy court initially reviewed and approved a professional's fee without knowledge that he had an interest adverse to the estate. 497 F. App'x at 886. Once the court learned of the adverse interest, it had the authority to revisit the professional's prior fee award. Id.

### ii. Disclosure Pursuant to Rule 2014

Whether a professional is disinterested and may be employed under section 327 is a separate question from whether the professional adequately disclosed all connections. See In re Condor Sys., 302 B.R. 55, 74 n.32 (Bankr. N.D. Cal. 2003) (quoting In re EWC, Inc., 138 B.R. 276, 281 (Bankr. W.D. Okla. 1992)). Rule 2014(a) "effectuates [section] 327(a)'s disinterestedness requirement, and mandates that a[n . . . ] application to employ the professional 'be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States

27

Trustee.'" Vascular Access, 613 B.R. at 625 (citing In re Jade Mgmt. Servs., 386 Fed.Appx. 145, 150 (3d Cir. 2010) (quoting Rule 2014(a)).

The professional seeking to be retained must make "[f]ull, complete, and timely disclosure" of all the professional's connections to the debtor, creditors and any other party in interest. In re Harris Agency, LLC, 451 B.R. 378, 390 (Bankr. E.D. Pa. 2011); see also In re B.E.S. Concrete Prods., Inc., 93 B.R. 228, 237 (Bankr. E.D. Cal. 1988). While the term "connections" is not defined in Rule 2014(a), the disclosure requirements of Rule 2014(a) are much broader than the rules governing disqualification, and an applicant must disclose all connections regardless of whether they rise to the level of a disqualifying interest under section 327(a). See Granite Partners, 219 B.R. at 35 (citations omitted) (emphasis added). The disclosure requirements of Rule 2014 are strictly applied and impose an independent duty upon the professional applicant; thus, failure to comply with the disclosure rules is a sanctionable violation, even if proper disclosure would have shown that the professional had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule. "[T]hese standards are 'strict' and . . . attorneys engaged in the conduct of a bankruptcy case 'should be free of the slightest personal interest' … [a]ccordingly, we are 'sensitive to preventing conflicts of interest' and require a 'painstaking analysis of the facts and precise application of precedent.'" I.G. Petroleum, L.L.C. v. Fenasci (In re West Delta Oil Co.), 432 F.3d 347, 355 (5th Cir. 2005) (citations omitted). "There is no de minimus threshold excusing [a professional] from failing to disclose" information regarding his connections. Greater Blessed Assurance Apostolic Temple, 2021 WL 1117760, at *3.

It is incumbent upon the professional to disclose all its previous contacts and professional connections so that the bankruptcy court can determine if there are any conflicts or potential conflicts. Miller Buckfire & Co., LLC v. Citation Corp. (In re Citation Corp.), 493 F.3d 1313,

1321-22 (11th Cir. 2007).  The bankruptcy court, not the professionals, must determine which prior connections rise to the level of an actual conflict or pose the threat of a potential conflict. See Granite Partners, 219 B.R. at 35.  "[I]t is the role of the court, and not the professional, to make the ultimate determination vis-à-vis the information disclosed and compliance with the Bankruptcy Code and Rules."  In re GSC Grp., Inc., 502 B.R. 673, 729 (Bankr. S.D.N.Y. 2013).  "[B]y making the determination there was no connection worth disclosing, the firm broke the "cardinal principle of Rule 2014(a) . . . [, it] arrogated to [itself] a disclosure decision that the Court must make" and deprived the court of its function to make a section 327(a) determination.  Condor Sys., 302 B.R. at 71.

Professionals cannot pick and choose the connections they deem relevant or important. United States v. Gellene, 182 F.3d 578, 588 (7th Cir. 1999).  As the bankruptcy court noted in In re Saturley, 131 B.R. 509 (Bankr. D. Me. 1991), carefully crafted, say-nothing disclosures are "coy" and insufficient because they require the court to "ferret out pertinent information from other sources."  Id. at 517.  The Court should not have to "rummage through files or conduct independent fact-finding investigations' to determine if the professional is disqualified.'"  Granite Partners, 219 B.R. at 35 (citations omitted); see also Rome v. Braunstein (In re Chestnut Hill Mort., Corp.), 158 B.R. 547, 551 n.3 (D. Mass. 1993) (observing that it is not the job of the bankruptcy judge to review all documents in the file to determine whether the professional's affidavit is truthful and comprehensive).

Although Rule 2014 does not explicitly require ongoing disclosure, see Granite Partners, 219 B.R. at 35, courts hold that professionals have an ongoing duty to update disclosures and to promptly notify the court if a potential conflict arises.  See West Delta Oil Co., 432 F.3d at 355 ("Case law has uniformly held that under rule 2014(a), (1) full disclosure is a continuing

responsibility, and (2) [a professional] is under a duty to promptly notify the court if any potential for conflict arises.") (citation omitted).  As one court explained, "[t]he need for professional self-scrutiny and avoidance of conflicts of interest does not end upon appointment."  Rome, 19 F.3d at 57-58; accord In re Unitcast, Inc., 214 B.R. 979, 986 (Bankr. N.D. Ohio 1997) (citation omitted). Continuing disclosure is necessary to preserve the integrity of the bankruptcy system by ensuring that the trustee's professionals remain conflict free.  See EWC, Inc., 138 B.R. at 280-81.

In addressing Rule 2014 violations, a bankruptcy court has wide discretion to determine whether nondisclosure justifies remedial measures and, if so, which.  See Citation Corp., 493 F.3d at 1321-22 ("[n]either Rule 2014 nor the Bankruptcy Code mandates a sanction for the violation of Rule 2014.  In such situations, whether to impose a penalty and the nature and extent of the penalty is generally a matter left to the bankruptcy court's discretion").  Decisions in this area are fact-specific and have run the gamut, from nominal reductions to complete disallowance.

On the one hand, a willful or intentional failure to disclose merits the harshest sanctions.  Banner v. Cohen, Estis & Assocs., LLP. (In re Balco Equities Ltd.), 345 B.R. 87, 112 (Bankr. S.D.N.Y. 2006) (citations omitted).  Given the important role of disclosure, bankruptcy courts punish a willful failure to disclose connections required by Rule 2014 as severely as attempts to put forth a fraud upon the court.  Crivello, 134 F.3d at 839.  Purposefully vague and misleading disclosures also warrant considerable sanctions.  See In re Matco Elecs. Grp., Inc., 383 B.R. 848, 853, 856 (Bankr. N.D.N.Y. 2008).

On the other hand, a reduction in fees is generally not warranted when nondisclosure is unintentional and harmless.  See e.g., In re Raymond Prof'l Group, Inc., 421 B.R. 891,0907 (Bankr. N.D. Ill. 2009); In re Adam Furniture Indus. Inc., 191 B.R. 249, 260 (Bankr. S.D. Ga. 1996).  But, "[a] professional may be sanctioned for incomplete disclosures even if proper disclosure would

have shown that the professional was disinterested". Jacques H. Geisenberger, Jr., P.C. v. DeAngelis, 2011 WL 4458779, at *6 (M.D. Pa. 2011). For example, in Vascular Access, 613 B.R. at 616, the law firm had an engagement letter with the partner of the ultimate debtor. The representation lasted only a few days before the firm realized the debtor entity should be the entity to file bankruptcy, and the firm did not receive any fees in connection with the representation. Id. The law firm provided a very general disclosure in the bankruptcy case that eliminated the critical fact of the execution of the engagement letter, the identity of the first "contact," and what was really done. Id. While the court found disqualification was not required (the law firm merely had a potential conflict of interest since the firm did not represent both parties at the same time), the court found the firm's fees should be reduced due to the firm's failure to disclose all relevant information. Id. at 616-17.

### iii.  Disqualification

Movants ask the Court to disqualify GR. The request is now moot as GR's work is complete and it no longer serves as financial advisor to the Trustee.

### b.  Mr. Glass

### i.  Appointment of a Chapter 11 Trustee

The standards for approval of a Chapter 11 Trustee are different from those that apply to his professionals because a Chapter 11 trustee is not appointed under section 327. Rather, section 321 provides, in pertinent part, "A person may serve as trustee in a case under this title only if such person is an individual that is competent to perform the duties of trustee[.]" 11 U.S.C. § 321(a)(1).

While former Rule 209(d) specifically required that a trustee have no interest adverse to the estate, section 321 does not require that a trustee have no interest adverse to the estate. 3 Collier on Bankruptcy P 321.02 (16th 2020). However, the requirement that a trustee be a

"disinterested person" has been expressly incorporated under various sections of the Code including section 1104(d), which provides:

> If the court orders the appointment of a trustee . . ., then the United States trustee, after consultation with parties in interest, shall appoint, subject to the court's approval, one disinterested person other than the United States trustee to serve as trustee . . . in the case.

Thus, the same definition of disinterestedness discussed above applies to a Chapter 11 trustee. The disinterestedness definition includes some concept of adverse interest, but as discussed above, it is slightly different from section 327.

### ii. Trustee Disclosure

A trustee is obligated under Rule 2007.1 to disclose connections. The "trustee is required to disclose all facts that may have a bearing on his disinterestedness." In re Bennett Funding Grp., Inc., 226 B.R. 331, 335 (Bankr. N.D.N.Y. 1998).

Rule 2007.1(c) provides:

> The application shall be accompanied by a verified statement of the person appointed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

The 1991 Advisory Committee Note to Rule 2007.1 explains that information about connections is required "in the interest of full disclosure and confidence in the appointment process and to give the court all information that may be relevant to the exercise of judicial discretion in approving the appointment of a trustee or examiner in a chapter 11 case."

As with disclosures required by Rule 2014, it is incumbent on the person seeking to serve as trustee to make full disclosure; the court should not have to rummage through files or conduct its own investigation to determine if the person is disinterested. Disclosure is particularly important because, while the U.S. Trustee appoints a Chapter 11 trustee, it is the court that must

approve the trustee.  11 U.S.C. § 1104(d); In re Plaza de Diego Shopping Ctr., Inc., 911 F.2d 820, 827 n.12 (1st Cir. 1990).  The court can only make its evaluation and determine if approval is appropriate based on the information disclosed.  It is not the job of the bankruptcy judge to review all documents in the file to determine whether an affidavit is truthful and comprehensive.  Rome, 158 B.R. at 551 n.3.

iii.  Removal of a Trustee

The Thakkars seek to remove Mr. Glass from serving as trustee.  Section 324(a) provides the court may remove a trustee for cause.  11 U.S.C. § 324(a).  "Removal of a bankruptcy trustee is probably as serious of an action as a bankruptcy judge could possibly decide.  Accordingly, any allegations that a trustee should be removed must be proven by clear and convincing evidence, not by a mere preponderance of evidence."  In re Walker, 2004 WL 3152787, at *1 (S.D. Fla. Dec. 1, 2004), aff'd sub nom. Walden v. Walker, 2006 WL 8451170 (S.D. Fla. Mar. 8, 2006), aff'd sub nom. In re Walker, 515 F.3d 1204 (11th Cir. 2008); see also In re Empire State Conglomerates, Inc., 546 B.R. 306, 317 (Bankr. S.D.N.Y. 2016).

"Cause" for removal is not defined and may exist in a variety of circumstances.  Lack of disinterestedness may constitute cause and grounds for removal.  For example, in Walker, 2004 WL 3152787, at *3, 14 (S.D. Fla. Dec. 1, 2004), the Chapter 7 trustee indicated on her verified statement that she had no connections with any creditors.  The court found the trustee failed to disclose that she served as a registered agent for entities owned and controlled by an unsecured creditor and lied about the connections both on the verified statement and during oral testimony before the court.  Id.  The court found the trustee's statements amounted to fraud and constituted cause for removal under section 324(a).  Id. at *15; see also Marvel Entm't Grp., 140 F.3d at 476.

The U.S. Trustee contends Mr. Glass cannot be removed as Trustee pursuant to section 324 because he is no longer serving as trustee.  The Court agrees.  Pursuant to section 1141(b), unless otherwise stated in the plan or the order confirming the plan, confirmation vests all of the property of the estate in the debtor.  11 U.S.C. § 1141(b).  Accordingly, once the plan is confirmed, the duties of a Chapter 11 trustee appointed pursuant to section 1104 are essentially completed.  A plan may provide for a "plan trustee" to perform post-confirmation duties; the "plan trustee," however, is a separate and distinct entity from the previously appointed Chapter 11 trustee.  While a Chapter 11 trustee appointed pursuant to section 1104 is appointed by the U.S. Trustee and directed by statutory mandates of the Bankruptcy Code, the Bankruptcy Rules, and requirements of the U.S. Trustee, a "plan trustee" is selected and generally governed by the terms of the plan.  This is true even if the Chapter 11 trustee and the "plan trustee" are the same person.  See Department of Justice Chapter 11 Trustee Handbook.  And, as other courts have noted, "[i]t is questionable whether [section] 324 applies to a post-confirmation liquidating trustee appointed pursuant to a plan or trust agreement."  In re Syntax-Brillian Corp., 554 B.R. 723, 726 (Bankr. D. Del. 2016).

At the time the Motions were filed, Mr. Glass was no longer serving as Trustee of either Nilhan Developers or NRCT.  Upon confirmation the Trustee was replaced by the Plan Agent and, accordingly, there is no Trustee who can be removed under section 324.

III.   **ANALYSIS**

a.  GR

The Court must decide whether GR, at any time during its employment, did not satisfy the disinterestedness and adverse interest criteria set forth in section 327(a).  GR contends it was

disinterested and did not hold or represent an adverse interest because it did not actually represent NCT since the Engagement Letter was not effective. The Court disagrees.

GR contends the Engagement Letter is not binding because assent to a proposed agreement must be communicated. "As a general proposition, however, '[a]ssent to the terms of a contract may be given other than by signatures.' . . . [A]cceptance may be inferred by part performance or other facts, such as acceptance of benefits or performance." Ga. Contracts Law and Litigation § 3:3 (2d ed. 2020). See also, Terry Hunt Constr. v. AON Risk Svcs., 272 Ga. App. 547, 552 (2005).

Notably, assent may be implied from the circumstances and the conduct of the parties. See Redmond & Co. v. Atlanta & Birmingham Air Line R., 129 Ga. 133, 142–143 (1907); Tom Brown Contracting v. Fishman, 289 Ga. App. 601, 603–604 (2008). In Cox Broadcasting Corp. v. National Collegiate Athletic Ass'n, 250 Ga. 391 (1982), the Georgia Supreme Court indicated that "the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement, and courts are free to consider such extrinsic evidence." Id. at 395. A professional relationship can be inferred from representations or conduct by the professional inducing a "reasonable belief on the part of the would-be client that he/she was being represented" by the professional. Telematics Corp. v. Networkfleet, Inc., 2011 WL 13217743, at *4 (N.D. Ga. Nov. 22, 2011) (citations omitted). An engagement letter is just one of many pieces of evidence signifying mutual assent between the parties. Meunier Carlin & Curfman, LLC v. Scidera, Inc., 2018 WL 10396435, at *2 (N.D. Ga. Dec. 26, 2018).

Under the terms of the Engagement Letter, it became effective upon execution. While GR did not receive the signed Engagement Letter or instructions to proceed with its representation of

NCT and Gateway, the Engagement Letter together with the actions of the parties created a contract for GR's engagement with NCT.   The email communications surrounding the Engagement Letter show there was a meeting of the minds about the scope of the proposed engagement.   The parties agreed to the language of the contract and to what was intended—Mr. Ratner was to serve as President and Director of NCT—and NCT's purpose in retaining GR—to ultimately gain control of Sugarloaf Centre Partners, LLC and Sugarloaf, the Debtor.

Further, the back-and-forth communications on September 7, 2018 indicate Mr. Ratner signed the Engagement Letter knowing it would be forwarded to Gateway for signature and knew timing was critical.   In an email sent at 1:55 p.m. on September 7, 2018, Mr. Jones wrote: "Please let us know that this meets with your approval and Clay will have it executed."   Mr. Townsend also emailed stating he was waiting for Mr. Ratner's approval before signing and sending to Mr. Good for signature.   He wrote, "I would like to have Ian's and my signature on the final I send to Carson please."   Mr. Ratner signed the Engagement Letter and Mr. Cristal emailed it to Mr. Jones and Mr. Townsend.

The Engagement Letter was then signed by Mr. Good on behalf of Good Gateway, LLC, just as Mr. Jones and Mr. Townsend said it would be.   Mr. Jones received a fully executed copy of the Engagement Letter on September 10, 2018.   While Mr. Jones did not forward the duly signed Engagement Letter, and GR had not seen the letter signed by Gateway until discovery related to this matter, it was signed on September 10, 2018.   Given the communications between the parties, this should not have been a surprise.   Mr. Ratner was told more than once, by both Mr. Jones and Mr. Townsend, that the Engagement Letter would be sent to Mr. Good for signature after he signed it.

Mr. Ratner testified he did not know he had been appointed as President and Director of NCT. However, Mr. Ratner was provided with a draft of a consent of shareholders appointing him as President, Secretary, and Director. Mr. Jones revised the Engagement Letter stating he was doing so to be consistent with the shareholder's consent. Further, Mr. Jones specifically asked for Mr. Ratner's "okay on the Shareholders Consent appointing Ian as President etc." Finally, Mr. Jones stated in his email on September 7, 2018 at 10:39 am, "We need to finalize the appointment as soon as possible because we have to file an objection to a motion to dismiss Sugarloaf Centre's bankruptcy." So, Mr. Ratner was told about his appointment, the reason for the appointment and the urgency for the appointment. Mr. Cristal responded, "[t]his all looks fine to me, subject to Ian's approval." Mr. Ratner then replied, "All good—thank you—proceed." The instruction to "proceed" convinces the Court that Mr. Ratner knew that he was engaged to serve as an officer and director, and he directed counsel to move forward with the steps to make that happen. Mr. Ratner was in fact identified as President and Director of NCT in the Florida Secretary of State's records. And NCT/Gateway filed their opposition to Sugarloaf's Motion to Dismiss on the same day as the Reinstatement, just as Mr. Jones had stated.

GR contends Mr. Cristal's email of September 17 shows GR did not know the letter had been signed. The Court does not read the email as addressing the execution of the Engagement Letter. Rather, Mr. Cristal was asking about next steps in the representation. The Court concludes the preponderance of the evidence shows the Engagement Letter was effective and Mr. Ratner was President and Director of NCT from September 10, 2018 until the 2019 Annual Report was filed listing a new President and Director on April 26, 2019. The question is whether he was disinterested as a result of serving in this capacity and, if so, whether that should be imputed to GR in each case, and whether GR held or represented an interest adverse to the estate as a result.

i.  NRCT

Mr. Ratner was an insider of NRCT.  An insider is, by definition, not a "disinterested person."  11 U.S.C. § 101(14).  An insider is an entity "whose close relationship with the debtor subjects any transaction made between the debtor and such entity to heavy scrutiny."  Miami Police Relief & Pension Fund v. Tabas (In re The Fla. Fund of Coral Gables, Ltd.), 144 F. App'x 72, 75-76 (11th Cir. 2005).  Section 101(31) defines "insider" in an illustrative manner to include:

> (B) if the debtor is a corporation—
>     (i) director of the debtor;
>     (ii) officer of the debtor;
>     (iii) person in control of the debtor;
>     (iv) partnership in which the debtor is a general partner;
>     (v) general partner of the debtor; or
>     (vi) relative of a general partner, director, officer, or person in control of the debtor;
>     . . .
> (E) affiliate, or insider of an affiliate as if such affiliate were the debtor . . . .

11 U.S.C. § 101(31) (emphasis added).

Section 101(2), in turn, provides an affiliate is, among other things,

> (A) [an] entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, …

> (B) [a] corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities…

Id.

As President and Director of NCT, Mr. Ratner was an insider of NCT.  NCT is an affiliate of Sugarloaf since it indirectly owns 50% of Sugarloaf.  NRCT was also an affiliate, and therefore an insider, of Sugarloaf since it indirectly owns the other 50% of Sugarloaf.  An insider of an affiliate is also considered an insider of the debtor, and, since Mr. Ratner was an insider of

Sugarloaf, the affiliate, he was also an insider of NRCT, the Debtor.  Because Mr. Ratner was an insider of NRCT, he was not a disinterested person pursuant to section 101(14) during the time he served as an officer and director of NCT.

Mr. Ratner's role as an insider, however, does not automatically create a disqualifying connection for his firm.  Here, though, GR's role in providing a President and Director to NCT made it not disinterested.  NCT engaged GR, not just Mr. Ratner, to work on its behalf.  This is evidenced by the Engagement Letter which stated the engagement was with the firm and contemplated Mr. Ratner and Mr. Cristal would work on the matter as well as "other staff as appropriate."  Moreover, Mr. Ratner was not alone in communicating with counsel for NCT and Gateway on behalf of GR; several emails to and from Mr. Cristal show he was intimately involved in the discussions regarding GR's engagement.  The Court concludes GR was not disinterested in the period while Mr. Ratner served as an officer and director of NCT pursuant to 11 U.S.C. § 101(14)(C) because it held an interest materially adverse to NRCT by reason of its direct and indirect relationship with NCT.

Even if Mr. Ratner is not an insider of NRCT, the Court finds GR represented an interest materially adverse to the estate while Mr. Ratner was an officer and director of NCT and therefore it was not qualified to be employed as a professional under section 327 during that period.  At the time GR was approved as financial advisor in this case, it was engaged to represent NCT and, indirectly, Gateway, the 100% shareholder of NCT, which held and asserted several economic interests that would tend to lessen the value of the NRCT bankruptcy estate.

First, NCT/Gateway objected to Sugarloaf's Motion to Dismiss which was supported by NRCT, the other indirect 50% owner of Sugarloaf.  According to Mr. Jones, opposing Sugarloaf

and NRCT was the <u>reason</u> for reactivating NCT at that time. So, the action of serving as an officer and director was an adverse action as to NRCT under the facts of this case.

Second, Gateway requested discovery from Sugarloaf and NRCT on July 31, 2018 (Case No. 15-58440 Docs. Nos. 856 & 857) relating to the management, organization, and formation of Sugarloaf's sole member, Sugarloaf Centre Partners, LLC, which is owned 50% by NCT and 50% by NRCT. Gateway explained it owned a 50% interest in Sugarloaf Centre Partners, LLC through NCT and sought additional information as to the management, organization, and formation of Sugarloaf and its sole owner to determine NCT's rights in the Debtor Sugarloaf and its owner. One of the purposes of GR's engagement was for it to serve as the controlling person in NCT and ultimately in Sugarloaf, certainly an interest adverse to Sugarloaf. Because NRCT co-owned the direct owner of Sugarloaf, such a move by NCT would also be adverse to the interest of NRCT which, at that point in time, continued to control Sugarloaf indirectly. This discovery request was outstanding when the Trustee was appointed and when GR was retained as financial advisor.

Third, by virtue of the Contribution Claim, Gateway held a replacement lien on the net proceeds of Bay Circle's claims for contribution and subrogation against the other Debtors. While Bay Circle may have a claim for contribution or subrogation (the Court has not determined Bay Circle has such a claim and has not fixed the amount of any such claim), Gateway is the real party in interest. And while the Court has not specified against whom Bay Circle might have a claim, because all the Debtors except NRCT liquidated property to satisfy Wells Fargo, NRCT is a likely target. The adversarial positions of Gateway and NRCT are evident since Gateway filed an adversary complaint on behalf of the Trustee against NRCT with respect to the Contribution Claim on August 13, 2019, initiating Adversary Proceeding No. 19-5284.

GR's role in this matter was central. When the Trustee was appointed, the Court specifically tasked him with investigating whether Bay Circle may have a claim, against whom, and the range of possible outcomes. The Trustee retained GR to use its financial analysis expertise to report to the Court about possible outcomes. GR conducted this analysis while Mr. Ratner was an officer and director of NCT, which was 100% owned by Gateway[6]. GR's relationship with Gateway creates at least the appearance of a conflict and a perception that it did not have the independence and impartial attitude required for an estate professional.

Fourth, Gateway asserted an interest in claims of Nilhan Financial in the NRCT case. The NRCT schedules listed claims in the amount of $13,953,776 and $91,524 held by Nilhan Financial. Thus, at the time the Engagement Letter was signed, Gateway stood to receive a significant sum (approximately $7 million if the Nilhan Financial claims were paid in full) from NRCT by virtue of its agreement with Nilhan Financial. Gateway's interest was evident by its zealous opposition to the objection of Niloy and Rohan Thakkar (NRCT's equity holders) to the payment of the claim. The Court ultimately disallowed Nilhan Financial's $13,953,776 claim but allowed the $91,524 claim to which no objection was made. It is important to note that the litigation over Nilhan Financial's claim occurred after Mr. Ratner was no longer an officer and director of NCT, but Gateway's interest in the Nilhan Financial claim existed while he was an officer and director.

These interests demonstrate NRCT and NCT/Gateway did not share an identity of interests and were directly contrary to each other. The interest of NCT, represented by GR, was material as described above, and the interest of NCT/Gateway represented by GR was on the very matters on which the Trustee was to serve and GR was to assist. NCT's and GR's role in the bankruptcy cases was identified in the Engagement Letter and known by GR from the start. The Court

---

[6] The Preliminary Report showing NRCT's potential liability was filed on March 29, 2019.

concludes GR was not disinterested based on its direct relationship and connection to NCT and GR represented a material interest adverse to the NRCT estate based on Mr. Ratner's role as officer and director of NCT for the period while he served in those roles.

      ii.  <u>Nilhan Developers</u>

The relationship between NCT and Nilhan Developers is not as direct as the relationship between NCT and NRCT, but is nevertheless sufficient to find that GR was not disinterested and represented a material interest adverse to the estate during the time that Mr. Ratner served as an officer and director of NCT.

The Bankruptcy Code defines "insider" to <u>include</u> an affiliate. The definition of "affiliate" includes a corporation, 20 percent or more of whose outstanding voting securities are directly or indirectly owned or controlled by the debtor or by an entity that directly or indirectly owns and controls 20 percent or more of the stock of the debtor. 11 U.S.C. §101(2)(B). Thus, corporations with common ownership are affiliates and, therefore, insiders of each other. <u>Redmond v. Ellis County Abstract & Title Co. (In re Liberty Livestock Co.)</u>, 198 B.R. 365, 371 (Bankr. D. Kan. 1996); <u>In re Lettick Typografic, Inc.</u>, 103 B.R. 32, 38 n.7 (Bankr. D. Conn. 1989); <u>In re TS Employment, Inc.</u>, 2015 WL 4940348 (Bankr. S.D.N.Y. Aug. 18, 2015).

In this case, the ownership of NRCT and Nilhan Developers is the same, with Niloy and Rohan Thakkar owning each. As such, NRCT is an affiliate of Nilhan Developers. The Court has ruled above that Mr. Ratner was an insider of NRCT while he served as an officer and director of NCT. An insider of an affiliate is an insider of the debtor, 11 U.S.C § 101(31)(E), so he was also an insider of Nilhan Developers during the time he served NCT. As discussed above, Mr. Ratner's insider status is imputed to GR under the facts of this case and GR is not disinterested under 11 U.S.C. § 101(14)(C).

But even if Mr. Ratner was not an insider of Nilhan Developers, GR represented a material interest adverse to the Nilhan Developers' estate while it represented NCT.  As described above, Gateway (the 100% owner of NCT which appointed Mr. Ratner) held a financial interest in the claims of Nilhan Financial against Nilhan Developers. The Nilhan Developers schedules listed debts owed to Nilhan Financial in amounts of $9,500,000, $83,672, and $15,434.07.  The equity owners (Niloy and Rohan Thakkar) objected to the $9.5 million claim as having been satisfied. As in the NRCT case, Gateway vigorously opposed the reductions in the claims as asserted by Niloy and Rohan Thakkar.  The Court ultimately reduced the scheduled claim and allowed Nilhan Financial a claim in the Nilhan Developers case in the amount of $2,300,000 in addition to the claims of $83,672 and $15,434.07, to which no objections were made.  Again, it is important to note the litigation on Nilhan Financial's claim occurred after Mr. Ratner was no longer an officer or director of NCT, but Gateway's interest in Nilhan Financial's claim existed while he was an officer and director.

Because GR was not disinterested and represented a material interest adverse to the Nilhan Developers' estate while Mr. Ratner served as an officer and director of NCT, it was not authorized to serve as a professional person under section 327 during that period.

### iii.   GR's Disclosures Were Inadequate

GR contends it adequately disclosed all connections it had with Gateway.  The Court disagrees.  GR made no disclosure of its relationship to NCT in its application to serve as financial advisor, nor did it supplement its disclosure.  While Mr. Glass made some disclosure of the connection, that is not the same as GR disclosing its connection, and GR cannot fully rely on it, at least where it was not incorporated or referenced in any way.

Mr. McCaleb stated in his affidavit that GR "may have been engaged by certain creditors and other parties in interest or their attorneys, accountants, or professionals in other matters unrelated to the Debtors' jointly-administered cases."  This broad statement is vague and misleading.  It states GR may have represented creditors in unrelated matters, but GR's connection with NCT was directly related to these bankruptcy cases, as GR was retained specifically to file an action to gain control of Sugarloaf in its Chapter 11 bankruptcy case.

Later, when Mr. Ratner learned he had been listed in the Reinstatement as President and Director of NCT, GR remained silent.  GR did not amend its disclosures despite its prior representations it would do so and despite the ongoing duty professionals have to update disclosures.  In fact, Mr. McCaleb never amended his affidavit, and no subsequent disclosures were ever made to the Court.  Were it not for the Motions, the Court would likely never have learned about GR's connections to Gateway and NCT and the Reinstatement.

GR contends its relationship with Gateway and NCT was brief and minimal, but there is no *de minimus* threshold excusing a professional from the disclosure requirements.  Despite GR's representations, the Court finds the connection extremely significant and one that should have been disclosed under Rule 2014(a).  The Court is not concerned merely with the technical questions of who an applicant represents and whether an applicant serves as an officer.  Rather, it is the breadth of disclosure that allows the Court to determine if an applicant like GR, directly or indirectly, or for any reason, should be disqualified.  GR was contacted to act on behalf of Sugarloaf Centre Partners, LLC, the owner of one of the Debtors in these cases, in a way directly adversarial to existing equity in the Debtors and Sugarloaf Partners.  GR knew it, but it did not disclose it. Moreover, the pervasiveness of Gateway's interests in these cases makes a lack of disclosure

44

critical.  Failing to disclose impairs the parties' confidence in the process where virtually every matter in the last three years has pitted a Thakkar interest against a Gateway interest.

GR ignored its obligations and the abundant case law that places the burden squarely on the professional to plainly, openly, and timely disclose all necessary information directly to the bankruptcy court.  The lack of disclosure thwarted the ability of the Court and the parties in interest to fully vet their connections at the outset of the case.  The discussion above shows full information about the connections between GR and Gateway by virtue of its ownership of NCT was critical and, if known, would likely have affected the Court's decision to approve GR as financial advisor.

b.  <u>Mr. Glass</u>

Section 101(14)(C) provides a professional is not disinterested if a person has "an interest materially adverse to the interest of the estate . . . by reason of direct or *indirect* relationship to . . . the debtor."  Further, the adverse interest may be based on "the specific reasons delineated in the statute or 'for any other reason.'"  <u>Marvel Entm't Grp.</u>, 140 F.3d at 476.  The Court finds Mr. Glass was not disinterested by reason of his direct relationship with Mr. Ratner and his indirect connection to NCT and Gateway.

The Court found cause to appoint a Chapter 11 trustee in these cases to provide an objective, dispassionate, and disinterested view regarding various matters in these cases, including analysis and resolution of the Contribution Claim and all other contested matters.  The Court desired a neutral party to mediate disputes between the Debtors and their creditors and to provide an independent analysis.  Mr. Glass was appointed as Trustee and, rather than being a truly impartial third party, he had ties to Gateway, a creditor who had taken an active role in the Debtors' cases and has been involved in extensive and contentious litigation against the Debtors and their management for years.

Mr. Glass is a named partner in the GR firm which was engaged by NCT. Mr. Glass has worked closely with Mr. Ratner for years. This is not a case involving a professional who is engaged on a discrete matter and closed off from others in the firm. Rather, the GR firm, of which Mr. Glass is a founder and integral part of the firm's continued operations, was engaged to do work by Gateway's counsel. Further, when the parties discussed the engagement, Mr. Glass was listed as a co-CEO in drafts of the Engagement Letter. Regardless of whether he knew he was included as a potential officer in NCT, the fact stands that he was considered when outlining GR's retention. His firm represented NCT and indirectly represented Gateway, and he worked closely with Mr. Ratner who served as President and Director of NCT when he was appointed as Trustee. These close relationships demonstrate Mr. Glass had at least a potential conflict of interest.

Moreover, Mr. Glass's disclosure was insufficient under Rule 2007.1. Mr. Glass did make a partial disclosure, and the Engagement Letter was shared with the U.S. Trustee. His communications with counsel for the U.S. Trustee, however, have turned out not to be entirely accurate. He stated the Engagement Letter was not executed (which evidence has shown to the contrary), and that "[n]o conversations or information was exchanged[.]" This statement was not accurate, as the abundant email communications demonstrate. Information about Sugarloaf and Gateway's interest in the case was also shared with GR in several emails and in the text of the Engagement Letter itself, which Mr. Glass had and shared, and in the shareholder's consent. Mr. Glass had to have known GR was retained specifically to take action against Sugarloaf; it was stated plainly in the Engagement Letter. This demonstrates Mr. Glass's failure to fully disclose the Engagement Letter was not inadvertent. He intentionally chose not to fully disclose the nature of the planned engagement. Further, Mr. Glass did not supplement or amend his disclosures at

any time even though he was aware that Mr. Ratner was identified on the Secretary of State's website as an officer and director of NCT.

    c.  <u>Waiver</u>

GR and the Trustee contend the Court cannot order disgorgement of fees because the NRCT and Nilhan Developers Chapter 11 plans released all claims against professionals arising from the bankruptcy case.

Section 13.4a of NRCT's confirmed plan (Case No. 15-58444 Doc. No. 131) is an exculpation provision that releases parties, including the Trustee and GR, "from, any claim, obligation, cause of action or liability . . . for any act or omission in connection with, relating to, or arising out of the Bankruptcy Case, . . . the Plan . . . or other occurrence taking place before the Effective Date . . . provided, however, that nothing in the Plan shall release . . . claims due to . . . gross negligence or willful misconduct." Section 13.4b is an injunction to bring such claims. The Nilhan Developers Plan (Case No. 15-58443 Doc. No. 225) includes a similar exculpation provision in section 13.4a and an injunction in section 13.4b.

A similar argument was raised and rejected in <u>New River Dry Dock</u>, 451 B.R. 586. There, the debtor hired a broker to sell its primary asset. The broker did not disclose his connections to the buyers. After the sale, the court confirmed the debtor's reorganization plan, which included a release by the debtor and creditors of claims against professionals employed by the estate. Later, an unsecured creditor alerted the court to the broker's relationship with the buyer and sought disgorgement of the broker's commission fees. The brokers argued such a claim was precluded as a matter of law because the plan of reorganization did not expressly preserve the right to pursue a claim for disgorgement of fees. The bankruptcy court disagreed. The court stated "[i]t would be improper to allow fees which were obtained through dishonesty and non-compliance with the

Bankruptcy Code only because a plan has been confirmed."  The court said it was particularly so because "the plan specifically carves out an exception to the clause releasing pre-confirmation professionals for 'gross-negligence or willful misconduct.'"  The bankruptcy court concluded the broker's failure to disclose his prior relationship in derogation of the disclosure requirements of Rule 2014 constituted willful misconduct akin to a fraud on the court and on the debtor's estate and, accordingly, claims related to the failure to disclose were excluded from the plan's release. Id. at 589-90.

On appeal, the district court agreed.  Denison, 2012 WL 75768, at *3.  The court noted professionals should not profit while the estate and creditors suffer, by virtue of the withholding of material information which would have affected the decision to appoint the professionals in the first instance.  On appeal, the Eleventh Circuit once again agreed that "[t]he plan's release of liability against professionals did not affect the bankruptcy court's authority over the fees paid to those professionals."  New River Dry Dock, Inc., 497 F. App'x at 886.  The bankruptcy court initially reviewed and approved the broker fee without knowledge that he had an interest adverse to the estate.  Once the court learned this fact, it had the authority to revisit the fee award.  Id.

The NRCT and Nilhan Developers' plans' release of liability against professionals does not affect the Court's authority over the fees paid to GR and the Trustee.  Before a professional can be paid, a bankruptcy court must review and approve the fees to be paid.  See 11 U.S.C. § 330(a); New River Dry Dock, 497 F. App'x at 886.  A bankruptcy court retains jurisdiction over an award of fees even after the conclusion of the bankruptcy case.  Id.  The Court has not yet approved GR's and the Trustee's fee requests on a final basis.  The Court has not examined the reasonableness of GR's or the Trustee's fees in the cases.  The Court retains jurisdiction to do so,

notwithstanding the exculpating language in the plan.  Further, as in <u>New River Dry Dock</u>, the exculpation provision in the plans did not release GR from willful misconduct.

Additionally, Section 3.3 of both plans set a deadline for the Trustee and his professionals to file applications for payment of administrative claims and for objections thereto.  The Court finds this demonstrates the parties did not intend to bar objections to fee applications.  The specific language of Section 3.3 contemplated parties would have an opportunity to raise objections to the Trustee's and his professional's requests for fees, notwithstanding the exculpating language of Section 13.4a.  Reading the plan as a whole, and recognizing the Court's obligation to review all fees, the Court finds the plans do not bar the claims for disgorgement in the Motions.

GR and the Trustee also contend a settlement agreement entered in the Nilhan Developers case bars the disgorgement of and objection to fees now.[7]  The Trustee filed a Motion for Entry of an Order Approving Settlement among the Trustee, Mr. Thakkar and his wife, Niloy Thakkar, Nilhan Developers (collectively the "Thakkar Parties"), and various parties related to Westplan (Case No. 15-58440 Doc. No. 1176).  The Court granted the motion on September 13, 2019 (Case No. 15-58440 Doc. No. 1209).

The settlement agreement included a release in paragraph 4(c) that provided that the Thakkar Parties for themselves and on behalf of their, inter alia, agents, children, successors, and assigns:

> absolutely, forever, fully, and finally, releases, waives, acquits, and discharges the Trustee, both personally and in his capacity as the Chapter 11 Trustee . . . from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, actions, causes of action, liabilities, defenses, liens, costs, and expenses of any nature . . . from the beginning of the world to the Effective Date of this Agreement[.]

---

[7] The agreement did not involve NRCT and has no bearing on the NRCT case.

The agreement further provided the Thakkar Releasing Parties—other than Nilhan Developers—agreed they "shall not object, and hereby waive and relinquish any rights for making any objection, to any application for compensation of reasonable fees or expenses made on behalf of the Trustee or any professionals of the Trustee for work performed in the bankruptcy case."  This latter provision specifically excluded Nilhan Developers.

The Court concludes the Settlement Agreement's release of liability does not affect the Court's authority over the fees paid to the Trustee and his professionals.  See 11 U.S.C. §§ 328(c); 330(a)(2).  As noted above, a bankruptcy court retains jurisdiction over an award of fees even after the conclusion of the bankruptcy case, and a bankruptcy court may deny fees to a professional "at any time" pursuant to section 328.  "[T]he mandatory provisions of section 327(a) do not allow for waiver".  Granite Partners, 219 B.R. at 34.  The Court's responsibility to "monitor the integrity of the proceedings" is among the reasons the Court must address any improprieties coming to its attention.  In re Vebeliunas, 231 B.R. 181, 187 (Bankr. S.D.N.Y. 1999).  The disqualifying conflict was not known at the time the parties entered into the Settlement Agreement and, once the Court learned of the conflict, it had the authority to consider GR's and the Trustee's fees in light of it.

d.  Sanctions

Movants seek full disgorgement and denial of GR's and the Trustee's fees and expenses.  The U.S. Trustee contends disallowance of all fees is not warranted but agrees GR's compensation should be reduced in light of the firm's failure to properly disclose its connections as required by Rule 2014.  GR and the Trustee contend a reduction is not warranted.  The Court finds a reduction of GR's and the Trustee's fees is appropriate under section 328 of the Bankruptcy Code and as a sanction for improper disclosure of both of their contacts with Gateway.  The Court, however, declines to deny all fees.

The decision to discount or deny fees under section 328(c) is within the discretion of the bankruptcy court, and the bankruptcy court's power to deny fees under section 328(c) is permissive.  The Court's decision must balance the acts of GR and the Trustee in failing to properly disclose connections and in failing to be qualified to serve against any harm caused to the estate and any benefit provided by GR and the Trustee.  The mere fact that the estate may not have suffered or established any actual financial loss is not the issue. Rather it is whether even the perception that the Trustee or GR were not impartial is sufficient on the given facts to justify sanctions.  The intent or willfulness of GR and the Trustee also contribute to a determination as to the proper sanction.

It is indisputable that neither GR nor the Trustee adequately disclosed the connections of Mr. Ratner and GR to the Gateway interests.  It is unfathomable to the Court that an Engagement Letter specifically identifying these consolidated cases and this judge was not disclosed to the Court, even if GR thought it was unsigned.  This is particularly true when the outcome sought in the Engagement Letter (replacing management in Sugarloaf with someone from GR) is exactly what happened when the Court appointed Mr. Glass as the Trustee and GR as his financial advisor. The innocuous description of the contact, compared to the actual relationship, is striking.  It is most disappointing to the Court that although GR, the Trustee, the US Trustee, and Gateway's counsel all knew the details of the proposed and (the Court finds consummated) engagement, not a single person thought to mention it in the almost three years since the contact occurred, notwithstanding that all of the foregoing parties have been before the Court for virtually every single hearing in this case.  The response that no one objected to the retention of GR or Mr. Glass is woefully short sighted.  As the case law makes clear, it is the duty of the proposed professionals to inform the court; it is not the duty of the court to make inquiry.  A failure to _fully_ disclose a

51

connection, even one that a professional may assume is insignificant, leads to exactly the situation in which we now find ourselves—at the end of hotly contested cases with doubt now cast on virtually every step of the process.

Moreover, GR and the Trustee failed to update their disclosures when they learned of the Reinstatement.  It is also very troubling that GR and the Trustee seemingly take no responsibility for their failure to disclose.  They place the responsibility of "discovering" the issue on everyone else—the U.S. Trustee, their counsel Morris Manning and Martin, the Court, and Mr. Thakkar.  To be clear, the responsibility of accurate disclosures is on the professional.  While the U.S. Trustee must propose the specific trustee, it is the Court who approves the trustee, not the U.S. Trustee.  So, it is the Court to whom the professional owes the duty, not the U.S. Trustee.

At the same time, the Court recognizes that Mr. Glass did disclose the full Engagement Letter to the U.S. Trustee, so an argument can be made that he did not attempt to hide the contact.  Moreover, while doubt has been cast on the cases by these late disclosures, no evidence was presented of actual harm to the estate.  To the contrary, the Court concludes GR and the Trustee did contribute to the NRCT and Nilhan Developers cases and did real work on which the Court relied.  For example, GR prepared monthly operating reports for the Debtors and it acted as a property manager and collected money due to the Debtors.  It assisted in making distributions and paying bills.  The Trustee sold a major asset of Nilhan Developers, generating substantial cash for the estate.  He proposed and confirmed both plans in these cases, a feat that would not have been possible without a trustee.

Balancing all of the facts, and using its discretion, the Court concludes that the appropriate sanction is to deny fees to the Trustee and GR for the period in which Mr. Ratner served as an

officer and director of NCT and/or his name appeared on the Secretary of State records as such. This period is from the inception of the Trustee's and GR's work through April 26, 2019.

As a further sanction, the Court will remove Mr. Glass as Plan Agent under both confirmed plans and remove GR from working for any Plan Agent in these cases.  The issues raised here now make it most difficult to move forward with either of them involved in these cases.

The failure of GR and the Trustee to fully disclose their contacts, by itself, justifies these sanctions and, to be clear, the Court would impose these sanctions even if it found that GR and the Trustee were disinterested and did not represent a material interest adverse to the estate.

## I.     CONCLUSION

The Court is very disappointed to find these cases and these parties in this situation. Disallowing fees and removing professionals is not something the Court looks forward to doing. But the bankruptcy process must be based on fairness and impartiality, both actual and perceived. The failure to properly disclose material contacts and the failure of the Trustee and GR to be disinterested and to be free of representation of adverse interests leads the Court to this conclusion

**IT IS THEREFORE ORDERED** that the fees otherwise allowable to GR and the Trustee for work performed from the date of inception through April 26, 2019 are disallowed.  When the Court hears the actual fee applications, it will make appropriate orders as to the amounts and whether disgorgement is required based on the amounts allowed and the amounts paid.

**IT IS FURTHER ORDERED** that Mr. Glass is removed as Plan Agent in both the NRCT and Nilhan Developers plans and GR is also removed as professional to the Plan Agent and barred from being employed by any subsequent plan agent effective as of the appointment of a replacement agent.

**IT IS FURTHER ORDERED** that the Motion for Involuntary Dismissal is **DENIED**.

<u>**END OF ORDER**</u>

**Distribution List**

Frank W. DeBorde
Lisa Wolgast
Morris, Manning & Martin, LLP
3343 Peachtree Rd NE, Ste 1600
Atlanta, GA 30326

William A. DuPré, IV
Miller & Martin PLLC
1180 W Peachtree St NW, Ste 2100
Atlanta, GA 30309-3407

David Weidenbaum
Office of the U.S. Trustee
75 Ted Turner Dr SW, Rm 362
Atlanta, GA 30303

Frank B. Wilensky
Macey, Wilensky & Hennings, LLP
5500 Interstate Pkwy North, Ste 435
Atlanta, GA 30328

Ronald L. Glass
Glass Ratner Advisory & Capital Group
3445 Peachtree Rd NE, Ste 1225
Atlanta, GA 30326

M. Denise Dotson
M. Denise Dotson, LLC
PO Box 767
Avondale Estates, GA 30002

John A. Moffa
Moffa & Breuer, PLLC
3081 E. Commercial Blvd, #204
Fort Lauderdale, FL 33308